# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JANAY E. GARRICK, | ) |
| *Plaintiff,* | ) |
| | ) Case No. 18-cv-00573 |
| v. | ) |
| | ) Judge Lee |
| MOODY BIBLE INSTITUTE, | ) Magistrate Judge Kim |
| *Defendant.* | ) |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Moody Bible Institute ("Moody") moves to dismiss plaintiff Janay Garrick's claims under Rules 12(b)(1) and 12(b)(6). As shown below, its motion should be denied.

**I.  Moody's motion raises no jurisdictional issues and relies on matters outside the pleadings.**

**A.  Moody advances no arguments to support a motion under Rule 12(b)(1).**

Moody styles its motion to dismiss as one "pursuant to Rule 12(b)(1) and 12(b)(6)." A Rule 12(b)(1) motion challenges the Court's subject matter jurisdiction over the case. Moody brings no such challenge, so its motion, as far as Rule 12(b)(1) is concerned, is baseless. The ministerial exception, upon which Moody primarily relies, is not jurisdictional – instead, it is an affirmative defense that requires an in-depth factual analysis, as both the Supreme Court and the Seventh Circuit have made clear. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 195, fn 4 (2012) ("[w]e conclude that the [ministerial] exception operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar."); *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 657 (7th Circuit 2018) (the ministerial exception "is subject to a fact-intensive analysis. And usually such questions are left for a jury.").

The only substantive mention of Rule 12(b)(1) in Moody's brief appears in Footnote 1, where Moody, citing *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015), claims that the Court may go beyond the pleadings when considering such a motion. There is no further discussion of Rule 12(b)(1), or the issue of the Court's jurisdiction over this case, anywhere in the brief, suggesting that Moody has invoked Rule 12(b)(1) merely to attempt to justify attaching 109 pages of exhibits to its memorandum. This tactic should be rejected, and its motion to dismiss as to Rule 12(b)(1) must be denied.

**B.  Either the extraneous materials submitted by Moody should be disregarded, or its motion should be converted to one for summary judgment.**

Rule 12(d) holds that if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Moody has, indeed, presented matters outside the pleadings in its motion to dismiss – not only the 109 pages of exhibits, but also a number of unattributed, material, and disputed facts that appear throughout its memorandum (which will be discussed more fully in below). As such, the plaintiff respectfully requests that the Court either disregard all extraneous materials and the arguments that rely upon then – which will, in effect, dismantle Moody's motion – or convert the motion to one for summary judgment and give Ms. Garrick the opportunity to present all the materials she needs to oppose the motion.

Where, as here, a Rule 12(b)(6) motion relies on extraneous materials that contain material, disputed facts, the Seventh Circuit has repeatedly emphasized that the responding party must be afforded notice and the opportunity to respond in kind. *R. J. Corman Derailment Servs., L.L.C. v. Int'l Union, Local Union 150*, 335 F.3d 643, 649 (7th Cir. 2003) (grant of motion to dismiss reversed and remanded "because … the district court did not follow the proper

2

procedures here, and thus did not give [plaintiff] the chance to contest the facts on which it based its *de facto* summary judgment"); *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997) ("[t]he consideration of outside matter without converting the motion may result in reversible error"); *Peckmann v. Thompson*, 966 F.2d 295, 298 (7th Cir. 1992) ("to grant the motion when the supporting documents the rule contemplates are not before the court is to deprive the nonmovant of the opportunity to be heard on the existence of disputed factual issues."). The Fifth Circuit, reviewing a case much like this one involving whether the ministerial exception applied, reached the same conclusion. *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 171-172 and fn 3 (5th Cir. 2012) (the lower court "should have converted the … motion for dismissal into a Rule 56 motion for summary judgment" because …. "only in the rarest of 3 circumstances would dismissal under Rule 12(b)(6) … be warranted.").

MBI incorrectly asserts that *Hosanna-Tabor* stands for the proposition that "religious liberty defenses like Moody's must be adjudicated at the outset of the matter" and, as a consequence, the Court should decide its motion to dismiss without the benefit of any development of the record. In fact, *Hosanna-Tabor* holds exactly the opposite – there, the Supreme Court reviewed a grant of summary judgment *after* discovery had been completed, and its decision was wholly fact-driven. 565 U.S. at 190. Similarly, the Seventh Circuit's opinion in *Grussgott* was a fact-intensive review of a decision on summary judgment. 82 F.3d at 657.[1]

---

[1] The two pre-*Hosanna-Tabor* Seventh Circuit cases Moody cites also support development of the record before evaluating the ministerial exception: in *Schleicher v. Salvation Army*, 518 F.3d 472 (7th Cir. 2008), dismissal on a Rule 12(c) motion was affirmed, but only after the district court held an evidentiary hearing in which the plaintiff had the opportunity to present her evidence. And in *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698 (7th Cir. 2003), the Seventh Circuit applied its old standard (not the new, post-*Grussgott* four-step factual inquiry), and the parties did not dispute the nature of the plaintiff's position, as they do here.

**C.     If Moody's motion is converted to a motion for summary judgment, the plaintiff seeks leave to take discovery on the ministerial exception and present pertinent material to the Court.**

As shown above, Moody's position that its ministerial exception defense must be adjudicated before the plaintiff has had the opportunity to take discovery is refuted by the controlling case law. Because Moody relies on materials outside the pleadings that raise disputed issues of fact, the plaintiff respectfully requests that the Court convert Moody's motion to one for summary judgment pursuant to Rule 12(d). She further requests leave to submit a declaration to the Court under Rule 56(d) to detail the discovery she needs to prepare her opposition to Moody's motion. Under similar circumstances, other courts have opted for this course. *Collette v. Archdiocese of Chi.*, 200 F. Supp. 3d 730, 735 (N.D. Ill. 2016) (denying defendant's motion to dismiss and ordering further discovery on ministerial exception because "determination of whether a discrimination plaintiff was a minister is both factual and case-specific").

**II.     The ministerial exception does not bar Ms. Garrick's claims.**

The centerpiece of Moody's Rule 12(b)(6) motion is that the ministerial exception – a constitutional doctrine that protects churches from interference with selection of their ministers – bars all of Ms. Garrick's claims. Memorandum, pp. 2-9. The ministerial exception is an affirmative defense that can only be established by a "fact-intensive analysis" considering (1) 'the formal title' given by the Church, (2) 'the substance reflected in that title,' (3) '[the teacher's] own use of that title,' and (4) 'the important religious functions she performed for the Church.'" *Grussgott*, 882 F.3d at 658 (*quoting Hosanna-Tabor*, 565 U.S. at 192). As Judge Chang recently noted, asserting the ministerial exception as an affirmative defense is "not even a failure to state a claim," but "the applicable legal standard is basically the same: the Court must decide whether, assuming the facts alleged in the complaint are true, the affirmative defense has been

4

established." *Sterlinski v. Catholic Bishop of Chicago*, No. 16-cv-00596, 2017 U.S. Dist. LEXIS 65613, *6 (N.D. Ill. May 1, 2017). Here, as discussed above, Moody has chosen to submit extraneous materials – including both exhibits and disputed factual assertions – in support of its motion to dismiss, implicitly conceding it cannot prevail unless the Court considers those materials. As shown below, even if the Court were to consider them without giving Ms. Garrick the opportunity to respond in kind, Moody has failed to establish its defense that the ministerial exception applies.

> **A. Moody forbids women from acting as ministers and required Ms. Garrick to remove the reference to being an ordained minister from her employment materials, so it cannot invoke the ministerial exception as a defense.**

First, and most importantly, Moody itself admits – quite freely – that its Doctrinal Statement bars women from serving as ministers. Memorandum, p. 4, fn 2 and Ex. C at 4 ("consistent with [Moody's] understanding of Scripture[,] [certain] church offices should be limited to the male gender"). Furthermore, archived pages from Moody's website show that the undergraduate pastoral ministry program was closed to women during the relevant time period. *See, e.g.*, https://web.archive.org/web/20160323154242/http://www.moody.edu:80/pastoral-ministry (archived March 23, 2016; last visited May 10, 2018) ("[t]he Pastoral Ministry major is designed for male students ….").[2] Having staked out the position that women cannot be ministers – and made it a cornerstone of its defense to this case – Moody cannot now seek dismissal of Ms. Garrick's lawsuit by arguing that she was acting as a minister at its behest. *Duncan v. Fleetwood Motor Homes of Ind.*, 518 F.3d 486, 491 (7th Circuit 2008) (inconsistent litigation positions were

---

[2]The Court may take judicial notice of a website if the information "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Hill v. Capital One Bank (USA), N.A.*, No. 14-cv-6236, 2015 U.S. Dist. LEXIS 12342, *14-15 (N.D.Ill. Feb. 3, 2015). Here, Moody's web page is relevant not to prove substantive facts, but to document how Moody represented its ministerial studies program to the public.

enough to show the defendant's proffered reason lacks legitimacy in pretext analysis); *United States v. Husband*, 312 F.3d 247, 253 (7th Cir. 2002) ("[w]hile the district court may make alternative legal findings, it cannot make inconsistent findings on pure questions of fact.").

Further, as alleged in the Complaint, Moody asked Ms. Garrick to remove any reference to her status as an ordained minister from her work record before it would consider hiring her as an Instructor (Cplt., ¶ 17). This alone should doom Moody's invocation of the ministerial exception: on the one hand, it refused to credit Ms. Garrick as a minister because of her gender and asked her to hide that part of her background, yet now, having been sued, it makes a complete about-face. Moody cannot have it both ways.

### B. Moody cannot satisfy the *Hosanna Tabor/Grussgott* test.

Even if Moody had not already foreclosed its argument under the ministerial exception by adopting the institutional position that women cannot be ministers and erasing Ms. Garrick's credentials, it cannot otherwise satisfy the four-part factual test from *Hosanna Tabor* and *Grussgott*, which requires the Court to review the formal title of Ms. Garrick's position, the substance reflected in that title, Ms. Garrick's own use of that title, and the religious functions she performed. *Grussgott*, 882 F.3d at 657. Moody relies heavily on language its Faculty Manual and Employee Information Guide (Memorandum, pp. 2, 7-8) – but these general-purpose policy documents say nothing about Ms. Garrick's role at Moody. It is undisputed that Moody had both a seminary and a secular undergraduate program of study. The manuals on which it relies purport to apply to everyone from the highest-level seminarians to entry-level instructors of secular topics like Ms. Garrick to cooks in the cafeteria (in the case of the Employee Information Guide). They provide no evidence about how Ms. Garrick's position was actually implemented or what work she actually performed.

6

In his concurrence in *Hosanna-Tabor*, Justice Alito explained that "courts should focus" primarily "on the **function[s]** performed by persons who work for religious bodies." 565 U.S. at 198 (bold added). But Moody has virtually nothing to say about the functions Ms. Garrick actually carried out. For example, it generalizes that faculty members "typically open class with prayer" (Memorandum, p. 2), but it provides no support for this statement, which is found nowhere in the text of either of the manuals it cites for the proposition. *See* Exs. A and B. Ms. Garrick, contrary to Moody's assertion, did *not* "typically open her classes with prayer" – a fact she seeks to present to the Court pursuant to her request in Part I.C. above. Furthermore, Moody affirmatively prohibited Ms. Garrick from leading student religious services when she submitted a written request for permission to do so – a material fact not currently in the record but that Ms. Garrick will to include as part of her defense, if allowed. Additional facts not currently in the record, but which Ms. Garrick will present with supporting documentation if this motion is converted to one for summary judgment, include the following:

- She was not required to complete any religious course of study or to demonstrate any religious knowledge to be hired as an Instructor of Communications.

- The subject matter of her classes was secular, not religious. Her job was to teach students to develop communication skills, utilize social media, and improve their writing.

- She taught no religious subjects and was never asked to incorporate religious matters into her coursework or syllabi, and her syllabi were not required to be reviewed or approved for religious content.

- She never led a religious service (and, as noted above, was prohibited from doing so when she asked for permission).

Moody next points to Ms. Garrick's application for employment in which she described her background and interests. Memorandum, p. 3. Again, this sheds no light on the factors the Supreme Court has asked lower courts to evaluate. The issue is not what Ms. Garrick's

credentials or qualifications were before she was hired – rather, it is what role she played at Moody once it hired her. As noted, Moody would not even consider Ms. Garrick for the position until she submitted a new resume that omitted reference to her ordination. Cplt., ¶ 17. Moody also makes much of Ms. Garrick's request that it certify her housing allowance application for tax purposes (Memorandum, pp. 3-4, Ex. K). But the application itself explicitly states that "by granting me the housing allowance, Moody in no way certifies that the services performed by me for Moody qualify as 'ministerial services.'" Ex. K, p. 2. Moody again takes two factually contradictory positions according to what suits it in the moment. And, of course, Ms. Garrick alleged in her Complaint that Moody did not offer her such a subsidy – she fought to be certified after learning about the process from a male faculty member. Cplt., ¶ 18.

    **C.    Moody's recounting of Ms. Garrick's termination relies on disputed and unverified facts extraneous to the Complaint.**

Moody next argues that the circumstances of her termination demand that it be immune to judicial oversight because "the Court must defer to Moody's views" regarding what was fundamentally a doctrinal dispute. Memorandum, pp. 4-6. In support of this argument, Moody states that "[i]n late 2016 and early 2017, statement and actions by Garrick began indicating her nonalignment with Moody's Doctrinal Statement." *Id*., p. 4. This is a prime example of Moody abusing the Rule 12 process – there is absolutely no attribution for this purported factual statement, which appears nowhere in the Complaint or on any of Moody's many pages of extraneous material. In fact, Ms. Garrick disputes this characterization and intends to introduce evidence that during her interview for the position in October 2014, there were four professors and two deans present; that she stated to all in attendance that she did not agree with the institution's position on gender roles in ministry; that one of the interviewers then asked, "What is the concern?"; and that she responded for all to hear, "I am egalitarian." She also intends to

8

show that she communicated her disagreement with Moody's Doctrinal Statement to three professors during another interview in October 2014, including the head of her soon-to-be department, and that she continued to make her disagreement with Moody's doctrinal statement as it related to gender roles in the ministry clear for the duration of her employment. And she has already alleged in her Complaint that Larry Davidhizar admitted during a meeting in April 2017 that he had heard her announce her disagreement with Moody's position on gender roles in the ministry during the October 2014 interview. Cplt., ¶ 53. This is important pretext evidence to rebut Moody's position that it was taken by surprise by Ms. Garrick's non-alignment, when, in fact, it knew all along and only took steps to terminate Ms. Garrick after her involvement in the Title IX activities alleged in her Complaint.

### III. Ms. Garrick has stated a claim under Title IX.

As shown above, Moody has not established that the ministerial exception applies to the functions Ms. Garrick performed. Turning to the substance of her Title IX claim, Ms. Garrick has adequately set forth a viable claim under that statute.

### A. Ms. Garrick has pled the necessary elements of her Title IX retaliation claim.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance …." 20 U.S.C. § 1681(a). Ms. Garrick has alleged that Moody retaliated against her for, among other things, assisting a female student in filing and prosecuting the student's Title IX complaint against Moody. The student wanted to enroll in Moody's pastoral ministry program but was denied because of her gender. Cplt., ¶¶ 23-24. During the course of Ms. Garrick's advocacy for the student, she learned that Moody had been barring women from its undergraduate ministry

9

program for decades, and she began working to change the policy. She was ultimately successful in doing so, and Moody now allows women to enter the program, though there is still some question about whether it continues to dissuade female applicants. *Id.*, ¶¶ 25-27, 30, 32-37.

Ms. Garrick alleges that her efforts in opposing a Moody's Title IX violations led to her termination, and that Moody's actions violated the anti-retaliation provisions of Title IX that the Supreme Court first recognized in *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005). Moody attempts, throughout its motion, to recast Ms. Garrick's case in order to tell its preferred story – that she was terminated for her lack of compliance with its Doctrinal Statement, as discussed above, and that the decision is beyond the purview of the courts because it is religious in nature. But those are not the facts that Ms. Garrick pled – and this Court must accept all of her well-pled facts as true for the purposes of a motion to dismiss. She has satisfied the elements of her Title IX retaliation claim by alleging that she engaged in protected activity (Cplt., ¶¶ 27, 40); that Moody took materially adverse actions against her by denying a promotion and terminating her (*Id.*, ¶¶ 42-48 and 50-58); and that a causal connection exists between the activity and the adverse action (*Id.*, ¶¶ 28-30, 38, 41, 53). *Burton v. Bd. of Regents*, 851 F.3d 690, 695 (7th Cir. 2017) (setting forth components of Title IX retaliation claim).

**B.     Moody's other constitutional arguments add nothing to the Court's analysis.**

Moody also asserts that a set of miscellaneous doctrines ("ecclesiastical abstention," "church-autonomy," and "deference") also bar Ms. Garrick's Title IX claim. Memorandum, p. 9. But, as Judge Posner noted in *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1039 (7th Cir. 2006), "[t]he ministerial exception, and the hands-off approach more generally, do not place the internal affairs of religious organizations wholly beyond secular jurisdiction." Ms. Garrick does not dispute that the right of religious organizations to choose (or terminate) their own leaders is

constitutionally guaranteed under most circumstances. Rather, she seeks to hold Moody accountable for engaging in the type of unlawful, discriminatory behavior that is *not* constitutionally protected.

    **C.    Title IX's religious exemption does not preclude Ms. Garrick's claim.**

Citing no authority, Moody next argues that Title IX's statutory religious exemption bars Ms. Garrick's Title IX retaliation claim. Memorandum, pp. 9-10. Moody is incorrect. Title IX's built-in religious exemption states that "this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3). But in order to claim this exemption, the highest ranking official at the institution must submit a written statement to the Assistant Secretary for Civil Rights, identifying the provisions of Title IX it believes conflicts with its religious tenets. 34 C.F.R.106.12. Moody, which admittedly accepts federal funding, has not done so. Moody's website concedes that Title IX "applies to all members of the Moody community" and that it "expects members of the Moody community to comply with legal requirements" of Title IX. See https://www.moody.edu/about/reports-and-policies/title-ix/ (last visited May 9, 2018) and https://www.moody.edu/uploadedFiles/EDU/Website_Assets/Files/Reports/Title_IX_Policy_and_Complaint_Procedure.pdf (last visited May 10, 2018). Having announced that it is covered by Title IX and that it has not sought any exemptions, Moody cannot argue that the exemption bars Ms. Garrick's retaliation claim. And even if it attempted to claim an exemption after the fact, Moody would have trouble credibly arguing that barring women from its undergraduate ministry program – which currently admits women, with no apparent ill effects on the institution – could possibly conflict with its religious tenets.

### D. Title VII does not preempt Ms. Garrick's Title IX claim.

Moody also argues that Title VII preempts Ms. Garrick's Title IX claim. This is not the case, as evidenced by Moody's inability to point to a single authority so holding. In *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 171 F. Supp. 3d 830, 840 (W.D. Wisc. 2016), the district court rejected an identical argument, holding that an "expansive reading of the preemption rule would run headlong into the Supreme Court's decision in *Jackson*, which allowed a teacher to bring a retaliation claim under Title IX …." It noted that preemption would only be a possibility if the plaintiff brought a claim under Title IX identical to one she could have brought under Title VII.[3] Here, Ms. Garrick has sued Moody for retaliation under Title IX, alleging that she was penalized for opposing Moody's violations of Title IX with respect to its students. She has not asserted a sex discrimination claim on her own right and has not brought a Title VII claim. The *Burton* district court agreed this scenario does not result in preemption: "[because] these cases involved allegations of direct sex discrimination, not retaliation for conduct that Title IX protects, … Title VII does not preempt Burton's Title IX retaliation claim." *Id*. at 840.

The single case Moody cites – *Slabsiak v. Univ. of Tex. Health Sci. Ctr.*, No. 17-cv-597, 2018 U.S. Dist. LEXIS 30883, *3 (E.D. Tex. Feb. 27, 2018) – says nothing whatsoever about preemption. There, the defendant was not an institution covered by Title IX, which the plaintiff admitted. Nowhere in the six-paragraph opinion does the court even mention Title VII, much less make the sweeping ruling that Moody claims it does.

### IV. All of Moody's arguments against Ms. Garrick's breach of contract claim are unavailing.

#### A. There are no First Amendment defenses to the breach of contract claim.

---

[3]The Seventh Circuit later issued an opinion evaluating both the Title VII and Title IX claims, finding no reason to consider preemption. *Burton*, 851 F.3d at 696-697.

MBI advances two kinds of arguments against Ms. Garrick's breach of contract claim, which is premised on Moody's failure to pay the amount due under the termination provision of her Faculty Contract. *See* Cplt., ¶¶ 81-91. First Moody argues that the ministerial exception defeats the contract claim. Memorandum, pp. 7-8. As discussed in Section II above, Moody has failed to establish that the ministerial exception applies to Ms. Garrick. But even if it did, the breach Ms. Garrick alleges does not implicate religious matters. It has nothing to do with MBI's reasons for firing her – or whether the termination was lawful or justified. Rather, she alleges that MBI failed to follow its own termination policies, which required it to pay her for a certain period of time after making the decision not to renew her contract.

The breach of contract claim is a straightforward plea for wages due under the contract's termination clause, and MBI has absolutely no defense to such a claim based on First Amendment matters. *See Crymes v. Grace Hope Presbyterian Church, Inc.*, No. 2011-CA-00746-MR, 2012 Ky. App. Unpub. LEXIS 564, *3 (Ky. App. Aug. 10, 2012) ("unpaid salary and benefits for work previously performed is not an ecclesiastical issue but rather is fully within the jurisdiction of the court to adjudicate as a contract claim"); *Second Episcopal District African Methodist Episcopal Church v. Prioleau*, 49 A.3d 812, 817 (D.C. Aug. 9, 2012) (trial court can adjudicate contract using neutral principles of law without implicating ministerial exception).

B.  **Moody's other arguments against the breach of contract claim fail.**

Moody's second set of arguments against the breach of contract claim focuses on the language of the provisions in question. Memorandum, pp. 13-15. Moody first asserts that the termination provision is "hortatory, not promissory" – presumably meaning that it believes that the contract language is advisory only and need not be followed. Such a position is untenable in

13

light of the plain language of the Faculty Contract, which explicitly incorporates the termination provision from the Faculty Manual:

> MBI and the faculty member mutually agree that this contract will be binding on both parties except as modified by the mutual consent of the Trustees and/or the President and the faculty member, or unless terminated for cause, **in which case the procedures of termination stated in the current Faculty Manual and the Employee Information Guide will be followed by both parties.**

Moody's Exs. E and F (bold added). The version of the Faculty Manual in effect when Ms. Garrick was terminated[4] states:

### Termination

> If for some reason a faculty member is not to be retained after the Spring semester, notification will be given to the teacher concerning this decision by the last Friday in November of the Fall semester, except for serious violations of Institute policy which may result in immediate termination.

Cplt., Ex. B. There is no other way to read these two documents together: the Faculty Contract explicitly incorporates the termination provision of the Faculty Manual, which governs Moody's actions when a faculty member is terminated for cause. Moody's bid to avoid its contractual obligations by simply ignoring the plain language of the agreement fails.

Moody also suggests that Ms. Garrick has pled that the "real" reason for her termination was her nonalignment with Moody's Doctrinal Statement, which is an admission that she committed a "serious violation" that supported immediate termination under the provision above. Moody knowingly misrepresents Ms. Garrick's complaint – she makes no such concession. After explaining that Moody used her alleged noncompliance as an excuse, she goes on to state that MBI's decision was pretext for its true motives – discrimination and retaliation. Cplt., ¶ 56.

---

[4] Moody argues in Footnote 13 that Ms. Garrick relies on an outdated version of the Manual. This is yet another disputed issue of fact. If granted the opportunity she seeks in Part I above, Ms. Garrick intends to produce evidence, including emails from Moody administrators, confirming that the version attached to her Complaint was the operable version when she was terminated, and that the version quoted by Moody is a revision that became effective sometime after she left.

14

Finally, Moody parses the language of the termination provision, arguing that it cannot apply because Ms. Garrick did not allege Moody knew or should have known by the fall semester that she would not be retained in the spring. But there is no requirement in the Contract that Ms. Garrick allege this in order to invoke her rights under the termination clause, nor language anywhere in the policy documents that would lead to such a conclusion.

## V. Ms. Garrick will voluntarily dismiss her retaliatory discharge claim.

Ms. Garrick agrees that *Krum v. Chi. Nat'l League Ball Club, Inc.*, 365 Ill. App. 3d 785, 790 (1st Dist. 2006) holds that "absent a statutory basis, contractual employees … cannot bring a claim for retaliatory discharge when employers fail to renew an employment contract. While she respectfully disagrees with the court's rationale, she agrees to voluntarily dismiss her claim for retaliatory discharge under Illinois law.

## VI. Conclusion

For all of the reasons presented above, the plaintiff respectfully requests that the Court deny Moody's motion to dismiss in its entirety. In the alternative, she requests that the Court deny Moody's motion under Rule 12(b)(1) and either disregard the extraneous materials appended and asserted by Moody or convert its Rule 12(b)(6) motion to a motion for summary judgment. She further requests that the Court permit her to submit a declaration to the Court explaining the discovery she needs to adequately respond, and/or to give her the opportunity to submit all the material that is pertinent to the motion.

Dated this 11th day of May, 2018                    Respectfully submitted,

                                                    /s/ Jamie S. Franklin
                                                    Jamie S. Franklin

Jamie S. Franklin, ARDC No. 6242916
THE FRANKLIN LAW FIRM LLC
53 W. Jackson Blvd., Ste. 803
Chicago, IL 60604
(312) 662-1008
(312) 662-1015 (fax)
jsf@thefranklinlawfirm.com

**CERTFICATE OF SERVICE**

      I, the undersigned, certify that on May 11, 2018, I had the foregoing document served by filing it with the Court's ECF System.

                                            /s/ Jamie S. Franklin

Service List:

Christian Poland
Bryan Cave LLP
161 N. Clark Street, Suite 4300
Chicago, IL 60601
christian.poland@bryancave.com