# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JANAY E. GARRICK, )
         )
         **Plaintiff,** )
         )         **Case No. 18 C 0573**
         **v.** )
         )         **Judge John Z. Lee**
**MOODY BIBLE INSTITUTE and** )
**THE BOARD OF TRUSTEES FOR** )
**THE MOODY BIBLE INSTITUTE,** )
         )
         **Defendants.** )

## MEMORANDUM OPINION & ORDER

Plaintiff Janay Garrick, a former faculty member of Defendant Moody Bible Institute ("Moody"), has sued Moody and its Board of Trustees, alleging that it unlawfully terminated her employment because of her advocacy in favor of women serving as clergy members. Moody moves to dismiss Garrick's first amended complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), contending that its rights under the First Amendment's Religion Clauses bar Garrick's claims.[1] For the reasons that follow, Moody's motion [68] is granted.

## Background[2]

Moody is a post-secondary religious educational institution offering both undergraduate

---

[1] The Court previously granted Garrick's motion to voluntarily dismiss the Board of Trustees as a Defendant, *see* ECF No. 23, but Garrick has again included the Board as a Defendant. The docket does not reflect that the Board has ever been served. Accordingly, the Court dismisses the complaint as to the Board of Trustees of the Moody Bible Institute pursuant to Federal Rule of Civil Procedure 4(m).

[2] When reviewing a motion to dismiss, the Court assumes the alleged facts in the complaint are true and draws all possible inferences in favor of Plaintiff. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). In addition to the complaint itself, on a motion to dismiss the Court may consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

and graduate courses of study; it accepts federal financial aid. Pl.'s 3d Modified 1st Am. Compl. ("FAC") ¶¶ 1, 5, ECF No. 67. Garrick, who is proceeding in this lawsuit *pro se*, worked at Moody as an Instructor of Communications from December 1, 2014, to December 31, 2017. *Id.* ¶ 7.

Prior to being hired by Moody, Garrick was an ordained minister with a Master's degree in cross-cultural studies and a Bachelor's degree in creative writing and speech communications. *Id.* ¶ 20. She identifies as an "egalitarian Christian" and believes in gender equality in ministry. *Id.* ¶ 22. While interviewing at Moody, she informed her superiors of her egalitarian beliefs. *Id.* Moody hired her with "full knowledge" of her beliefs and twice renewed her contract with this knowledge. *Id.*

According to Garrick, she "quickly learned" that Moody "both tolerated and cultivated an environment that was hostile to female faculty and students." *Id.* ¶ 24. This was primarily driven by Moody's "complementarian" doctrine, which "excludes women from certain roles within the church due to their gender," *id.* ¶ 136, as well as Moody's general stances on gender and sexuality, *see id.* ¶¶ 30, 48. The conflict between Moody's and Garrick's views played out in a number of ways during her two-year tenure.

First, before Garrick's interview in October 2014, Larry Davidhizar, the Vice President and Associate Provost of Faculty, told Garrick to remove the statement that she was an ordained minister from her resume. *Id.* ¶ 25. Furthermore, when she was hired, administrators did not inform her that she could claim a tax deduction for housing costs as an ordained minister. *Id.* ¶ 26. Although she took steps to claim the deduction by filing her ordination license with Moody, she lost the opportunity to take the deduction for a full year. *Id.*

In February 2015, a lesbian student approached Garrick about hostility she was experiencing because of her sexual orientation. *Id.* ¶ 30. When Garrick brought the student's concerns to Tim Arens, the Dean of Student Life, he warned her that Moody had "community living standards." *Id.* The student was later expelled. *Id.*

In late 2015, Garrick was asked to assist in forming a committee to address women's concerns on campus—the "Respect for Women Personally and Ministerially" group. *Id.* ¶ 28. From the outset, this group was "viewed with suspicion and hostility," and administrators told Garrick to expect any change to be "small and incremental." *Id.*

Two other female students came to Garrick for help in October 2015 and January 2016, respectively. *Id.* ¶¶ 31–32. Both students wanted to enter Moody's Pastoral Ministry Program, but it was closed to women. *Id.* Garrick helped one of the students lodge a complaint against Moody under Title IX of the Education Amendments of 1972. *Id.* ¶ 35. But Garrick soon came under fire for this advocacy. At the inaugural meeting of the Respect for Women Personally and Ministerially group on February 17, 2016, she was rebuked for filing the complaint and asked how she could have "any integrity." *Id.* ¶¶ 36, 113–14.

Garrick met with Debbie Zelinski, the Vice President of Human Resources, on February 19, 2016, to address the "backlash" she had suffered from her Title IX advocacy, as well as "antagonism" she was suffering from male colleagues in a shared workroom. *Id.* ¶¶ 29, 115. Zelinski suggested that Garrick should simply avoid the workroom and get her own printer so she could work in her office instead. *Id.*

Garrick then met with Davidhizar and Bryan O'Neal, Dean of the Undergraduate Faculty, on February 23. *Id.* ¶ 38. Davidhizar and O'Neal suggested that she "might not be able to

continue in the faculty and told her she should voluntarily leave [Moody]." *Id.* ¶ 38, 116. Davidhizar additionally instructed Garrick to remove herself from her role in organizing and co-leading the Respect for Women Professionally and Ministerially group. *Id.* ¶ 117. Garrick resisted their suggestions and continued to fight in favor of female students entering the Pastoral Ministry Program, despite objections from administrators and other faculty members to women preaching. *Id.* ¶¶ 40–45.

At a meeting for faculty and administrators in September 2016, Garrick spoke out against a male theology professor's proposal to require all students to "sign a statement affirming their belief in and adherence to a biblically orthodox position on human sexuality." *Id.* ¶ 48. Along with a male faculty member, Garrick submitted a counter-proposal with an "inclusive" message. *Id.* In response, Davidhizar pulled her into his office the next day and told her that the speech was "inflammatory rhetoric," and that she was "not a Moody fit." *Id.* ¶ 49. Garrick alleges that her male co-presenter was never subjected to similar disciplinary action. *Id.*

Soon thereafter, Garrick submitted a written application for a promotion to Assistant Professor. *Id.* ¶¶ 50–51. Garrick asserts that she was qualified for the promotion and already had performed the work of an Assistant Professor, such as developing numerous courses, creating "institution-wide initiatives like the publication of a new art and theology journal," and developing an educational plan for ESL students. *Id.* ¶¶ 52–54. Still, Moody denied Garrick's request, stating that she needed to "improve her fit within the division." *Id.* ¶ 55.

Garrick then underwent a series of performance reviews. She first received an informal performance review on December 3, 2016, from Terry Strandt, Chair of the Music and Media Arts

Division, who congratulated her on "two years of excellent service," and described her teaching as "concise, clear[,] and engaging." *Id.* ¶ 57.

But in early 2017, Davidhizar told her that she had "performance and interpersonal issues," and that she should not expect to receive a contract renewal following Spring Recess. *Id.* ¶¶ 59, 120. Moreover, directly contradicting Strandt's review just months before, Brian Kammerzelt, the head of the Communications Program, told Garrick that Strandt had found her to be performing "below standards," and threatened to demote her. *Id.* ¶ 59.

Kammerzelt also informed Garrick that she had been subjected to peer reviews, which (according to Garrick) did not apply to male faculty members. *Id.* ¶ 97(b), 121(d). Garrick asked to see the results, but was never given the information. *Id.* ¶ 121(g). Garrick eventually received a formal performance review from Strandt on March 30, which criticized her performance. *Id.* ¶¶ 60, 121(a).

On April 5, 2017, Garrick received an email stating that Davidhizar would like to meet with her "to discuss [her] vocal non-alignment with [Moody's] doctrinal statement as it relates to 'Gender Roles in Ministry.'" *Id.* ¶ 122. On April 12, she met with Davidhizar and the Vice President of Human Resources. *Id.* ¶ 61.

During this meeting, Davidhizar told Garrick that she did not fit in at Moody, and that she was not "aligned with [Moody's] doctrinal statement as it related to gender roles in ministry." *Id.* Faculty members at Moody are required to annually sign its doctrinal statement, which describes certain gender roles for those in ministry. According to Garrick, however, Moody "selectively enforces adherence" to the doctrine, "and this enforcement disproportionately affects female faculty" like herself "who do not 'align' or 'adhere.'" *Id.* ¶¶ 67(i), 138(b)–139. For instance,

there were "key male Moody Radio personnel who did not affirm" the "Gender Roles in Ministry" statement but who remained employed at Moody. *Id.* ¶ 137.

Garrick was officially terminated on April 17 or 18, on account of "her egalitarian views on gender roles in ministry." *Id.* ¶¶ 62, 124. At the time, she was informed that she could continue teaching until the end of the semester and remain as a non-teaching faculty member until December 31, 2017. *Id.* ¶ 62. But, on April 26, Moody asked her to leave campus and return her keys without finishing the semester. *Id.* Garrick asserts that this was in response to her having spoken to students and student reporters about her termination. *Id.* ¶¶ 62, 124–25.

Garrick claims that her sudden ouster on April 26 violated the Faculty Manual and Employee Information Guide. The Manual, which Garrick contends is incorporated into the Faculty Contract, provides: "If for some reason a faculty member is not to be retained after the Spring semester, notification will be given to the teacher concerning this decision by the last Friday in November of the Fall semester, except for such serious violations of Institute policy which may result in immediate termination." *Id.* ¶¶ 81–85, *id.* Ex. B, Excerpt from Faculty Manual.

As a result, Garrick filed an internal grievance on May 17, 2017. *Id.* ¶ 63. In it, she alleged that Moody already had been aware of her doctrinal disagreement when it hired her and that it was only after she began advocating for students' Title IX rights that she was fired. *Id.* ¶¶ 63–64. Garrick alleges that Moody made her grievance process "impossible" and that she was denied "any manner of reasonable due process." *Id.* ¶ 126. Still, during the administrative hearing, Davidhizar admitted that Garrick had informed him of her egalitarian views during her interview in October 2014. *Id.* ¶ 127. Despite this testimony, Moody denied Garrick's

grievance on July 24, 2017, and it also terminated two female professors who had challenged Moody during Garrick's grievance process. *Id.* ¶ 66.

Outside of the events that led to her firing, Garrick alleges that women at Moody were generally subjected to different standards than men. For instance, she says, she was denied a reduced teaching load while completing a terminal degree in her field, even though men were given that accommodation. *Id.* ¶ 98. Not only that, but she was required to develop and complete five new undergraduate courses, which exceeded her stated responsibilities, while recently hired male instructors were not made to do the same. *Id.* ¶ 99.

Furthermore, Garrick claims, female instructors were confined to programs like the Communications Program, while "the more prestigious Bible and Theology Programs" were staffed exclusively by male instructors. *Id.* ¶¶ 27, 67(e)-(f). Moody's annual Pastor's Conference never included female speakers as main session speakers; there were a "disproportionate" number of male to female speakers at required student chapels; and female faculty were denied the opportunity to speak at "President's Chapel." *Id.* ¶ 67(b)-(c), 95(a). And there was a disproportionate number of male faculty and administration members as compared to women. *Id.* ¶ 67(f)-(h).

Women were also treated with hostility and faced discrimination, according to Garrick. For example, during Founder's Week in February 2017, male students organized a "walk out" when a woman was brought in as a speaker. *Id.* ¶ 67(a). Some Bible professors were "known to be 'overtly discouraging' to female students in their classes." *Id.* ¶¶ 67(d). A male professor once told Garrick that women in Moody's hiring process often needed to be "walked through" the doctrinal statement. *Id.* ¶ 101(b). Moreover, disparaging remarks were frequently made about

Garrick's dress, education, and understanding of her own theological positions. *Id.* ¶ 101(c)-(e). And there were "numerous reports of gender harassment and gender-based violence (sexual assault, rape) that went unaddressed or ignored by Moody administration[,] contributing to an unsafe campus environment for female students and faculty." *Id.* ¶ 102. Garrick says she complained numerous times to Moody administrators about this environment, to no avail. *Id.* ¶¶ 103–04.

## Legal Standards

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Additionally, when considering motions to dismiss, the Court accepts "all well-pleaded factual allegations as true and view[s] them in the light most favorable to the plaintiff." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013) (citing *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1027 (7th Cir. 2013)). At the same time, "allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678). As such, "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## Analysis

In Count I of Garrick's amended complaint, she alleges that Moody retaliated against her for engaging in activity protected by Title IX by "subjecting her to a hostile environment;

subjecting her to discriminatory disciplinary action; denying her a promotion; and unlawfully terminating her." FAC ¶ 76. Count II alleges breach of contract related to Moody's failure to provide the required notice of its intention not to renew her contract beyond the spring semester. *Id.* ¶¶ 81–91. In Count III, Garrick alleges that she was subjected to a hostile work environment and discrimination based on her gender. *Id.* at 16–19.[3] Count V asserts that she was retaliated against for complaining about sex harassment and discrimination. *Id.* ¶¶ 108–10, 121, 125–26, 129. Count VI alleges that she was subjected to religious discrimination because of her egalitarian positions, and gender discrimination given that men who held similar views were not treated similarly. *Id.* ¶¶ 134–40.

Moody moves to dismiss the complaint under Rule 12(b)(6) based upon the "ministerial exception" described in *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012); the statutory religious exemptions found in Titles VII and IX; the preemption of Title IX claims by Title VII; the statute of limitations under Title VII; and the complaint's overall failure to state a claim. It also argues that the complaint should be dismissed under Rule 12(b)(1) on account of the First Amendment's protection of religious liberties, variously described as "ecclesiastical abstention," "church autonomy," and "deference." *See* Mem. Supp. Mot. Dismiss at 10, ECF No. 69.

---

[3] The complaint contains a separate heading for "Count IV: Gender Discrimination," but no allegations under that heading. Because Count III also alleges instances of discriminatory treatment, the Court considers Count III to raise both a hostile-work-environment claim and a disparate-treatment claim based on gender.

## I.     Timeliness

Turning first to Moody's reliance upon the statute of limitations, Garrick claims that she was terminated on April 17 or April 18, 2017.   *See* FAC ¶¶ 62, 124.   She filed her charge with the EEOC on January 5, 2018, approximately 262 days later.   *See* FAC Ex. C, EEOC Charge. Moody contends that, because Garrick did not file the charge within 180 days, her Title VII claims are untimely.   Garrick counters that the 300-day time limit, rather than the 180-day limit, should apply here.

> Under Section 706(e) of Title VII, a charge of discrimination

> shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice . . . such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier.

42 U.S.C. § 2000e-5(e)(1).   Illinois has an agency with the authority to grant relief from unlawful employment practices; therefore, it is a so-called "deferral" state whose residents are not required to file a charge with the EEOC until 300 days after the discriminatory act, so long as they meet certain statutory requirements.   *See Gilardi v. Schroeder*, 833 F.2d 1226, 1230 (7th Cir. 1987).

The question is whether a plaintiff actually must file a charge with the state agency in order to benefit from the 300-day limitation.   *See, e.g.*, *Adams v. City of Indianapolis*, 742 F.3d 720, 729 n. 7 (7th Cir. 2014) (citing 42 U.S.C. § 2000e-5(c); 29 C.F.R. § 1601.13(a)(3)(ii)) ("In states that have an employment-discrimination agency, the plaintiff must file a charge with the state agency first and allow it 60 days to investigate before going to the EEOC.").   Decisions on this issue are somewhat unclear.   *Compare Gilardi*, 833 F.2d at 1230 (holding that 300-day rule

applies across the board because the EEOC is required to cross-file the claim with the state agency) *with Turner v. The Saloon, Ltd.*, 595 F.3d 679, 684 n.5 (7th Cir. 2010) (noting that the district court may have incorrectly applied the 300-day rule because the record suggested that the plaintiff did not file any charge with an Illinois agency).

The Court need not delve into this thicket today, however, because "[f]ailure to timely file an administrative charge is an affirmative defense," *Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 475 (7th Cir. 2009), and plaintiffs need not plead around affirmative defenses, *see Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016). Unless the complaint "unambiguously establish[es] all the elements of the defense," dismissal is inappropriate. *Id.*; *see also Stuart v. Local 727, Int'l Bhd. of Teamsters*, 771 F.3d 1014, 1018 (7th Cir. 2014). Here, the complaint is silent on whether Garrick filed allegations with the state agency. Accordingly, Moody's motion to dismiss the Title VII claims based upon the statute of limitations is denied.

## II. Church Autonomy: Title VII's Religious Exemption, the Ministerial Exception, and First Amendment Principles

Moody primarily defends against this action by pointing to its status as a religious institution and its beliefs as described by Garrick in her complaint. Although Moody raises several doctrines and statutory exemptions in support of its position, each of its arguments can be said to arise from the long-standing deference courts have afforded to religious institutions known as the "church autonomy" doctrine (sometimes called the "deference" doctrine or "ecclesiastical abstention").

The church autonomy doctrine has its roots in the First Amendment's Free Exercise and Establishment Clauses and "respects the authority of churches to 'select their own leaders, define their own doctrines, resolve their own disputes, and run their own institutions' free from

11

governmental interference." *Korte v. Sebelius*, 735 F.3d 654, 677 (7th Cir. 2013). "This dimension of religious liberty . . . is perhaps best understood as marking a boundary between two separate polities, the secular and the religious, and acknowledging the prerogatives of each in its own sphere." *Id.* As a result, federal courts should take care to not apply federal statutes in a way that fosters "excessive government entanglement" with the affairs of religious organizations. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971).

In accordance with this principle, courts have recognized that the First Amendment "permit[s] hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters." *Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich*, 426 U.S. 696, 724 (1976). Accordingly, "civil authorities have no say over matters of religious governance," and "secular judges must defer to ecclesiastical authorities on questions properly within their own domain." *Korte*, 735 F.3d at 678. Put simply, "[a] secular court may not take sides on issues of religious doctrine." *McCarthy v. Fuller*, 714 F.3d 971, 975–76 (7th Cir. 2013).

This constitutional concern for religious liberty is the foundation of the "ministerial exception" described in *Hosanna-Tabor*, 556 U.S. 171. There, the Supreme Court "recognized the right of churches to choose their own ministers (broadly understood) and adopted a constitutional ministerial exception to laws regulating employment discrimination." *Korte*, 735 F.3d at 677. Under *Hosanna-Tabor*, "religious organizations are free to hire and fire their ministerial leaders without governmental interference," including through application of federal employment discrimination laws. *Grussgott v. Milwaukee Jewish Day Sch.*, 882 F.3d 655, 657 (7th Cir. 2018).

Additionally, both Title VII and Title IX have codified elements of the church autonomy doctrine, providing exemptions for religious employers. *See Korte*, 735 F.3d at 678. Title VII provides that its prohibitions

> shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a). Title VII also states that

> it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

42 U.S.C. § 2000e-2(e)(2).

Similarly, Title IX notes that its prohibitions of sex discrimination "shall not apply to an educational institution which is controlled by a religious organization if" the application "would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3).

Moody argues that, because Garrick qualifies as a "minister," her claims must be dismissed under *Hosanna-Tabor*. Failing that, Moody argues that Garrick's Title VII and Title IX claims fall within the statutory exemptions and, furthermore, that her entire complaint implicates the church autonomy doctrine and invites excessive entanglement into religious matters. The Court will address each defense in turn.

But first, a jurisdictional matter. Moody claims that its religious autonomy wrests this Court of subject-matter jurisdiction. This is incorrect. "[T]he Supreme Court has repeatedly

reminded the lower courts of the narrow scope of truly jurisdictional rules." *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 491 (7th Cir. 2011). Indeed, in *Hosanna-Tabor* itself, the Supreme Court clarified that the ministerial exception is an affirmative defense, not a bar to jurisdiction. *See* 565 U.S. at 195 n.4; *see also Sterlinski v. Catholic Bishop of Chi.*, 934 F.3d 568, 571 (7th Cir. 2019). ("The ministerial exception is a defense, not a component of subject-matter jurisdiction[.]"); *Schleicher v. Salvation Army*, 518 F.3d 472, 478 (7th Cir. 2008) (noting that "[j]urisdiction is determined by what the plaintiff claims rather than by what may come into the litigation by way of defense"). Accordingly, the church autonomy principles upon which Moody relies give rise to an affirmative defense under Rule 12(b)(6), not a jurisdictional proscription that can be raised under Rule 12(b)(1). And, as an affirmative defense, a defendant's invocation of religious autonomy must be conclusively established from the face of the complaint. *See Hyson USA, Inc.*, 821 F.3d at 939.

### A.    Title VII Exemption

Turning to the merits, the Court agrees that the religious exemption described in Title VII applies to this case. But it does not, as Moody asserts, apply to bar all of Garrick's Title VII claims. Rather, "Title VII's exemptions are limited specifically to claims of discrimination premised upon religious preferences." *Herx v. Diocese of Ft. Wayne-South Bend Inc.*, 48 F. Supp. 3d 1168, 1175 (N.D. Ind. 2014); *accord Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011); *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996); *Elbaz v. Congregation Beth Judea, Inc.*, 812 F. Supp. 802, 807 (N.D. Ill. 1992). The statute's plain language supports this interpretation, as both exemptions speak to a religious organization's hiring of employees of "a particular religion." *See* 42 U.S.C. §§ 2000e-1(a);

2000e-2(e)(2).    Accordingly, Count VI, which claims that Moody discriminated against Garrick because of her different religious beliefs, is dismissed with prejudice.

### B.    Ministerial Exception

As for the ministerial exception, the Court notes that this issue is "subject to a fact-intensive analysis," of the type usually "left for a jury."    *Grussgott*, 882 F.3d at 657.    Relevant considerations include "(1) the formal title given by the Church, (2) the substance reflected in that title, (3) [the teacher's] own use of that title, and (4) the important religious functions she performed for the Church."    *Id.* at 658 (quoting *Hosanna-Tabor*, 565 U.S. at 192 (internal quotations omitted)).    In *Hosanna-Tabor*, the plaintiff, a "called teacher" at a religious school, was held out to the public as a minister and tasked with performing her job "according to the Word of God"; her title reflected a "significant degree of religious training followed by a formal process of commissioning"; she claimed a housing allowance on her taxes available only to those working in "ministry"; and she taught students religion and led them in prayer.    565 U.S. at 191–92.    In *Grussgott*, the plaintiff was held to be a minister even despite her role as a "grade school teacher," because she followed a unified curriculum incorporating religious teachings; taught her students about Jewish holidays, prayer, and weekly Torah readings; and practiced religion alongside her students by praying with them and performing rituals.    882 F.3d at 659–60.

Here, most of the facts on which Moody relies to support its application of the ministerial exception come not from Garrick's complaint, but from documents Moody submitted indicating the purpose and mission of the school, Garrick's practices while at the school, and statements she made in her employment application.    While these documents might be appropriately attached to a motion for judgment on the pleadings—or, even better, a motion for summary judgment—

consideration of them is not appropriate here, where the Court's task is to assess the plausibility of Garrick's allegations.[4]   *See Schleicher*, 518 F.3d at 478 (explaining that it is appropriate to invoke the ministerial exception in a motion for judgment on the pleadings, and if the plaintiff presents evidence rebutting the applicability of the exception, to treat the motion as one for summary judgment).   And, as the ministerial exception is an affirmative defense, *see Hosanna-Tabor*, 565 U.S. at 195 n.4, the defense must be clearly established from the face of the complaint, *see Hyson USA, Inc.*, 821 F.3d at 939.

Weighing in Moody's favor are its own status as a religious institution, the fact that Garrick took a housing-tax deduction for ordained ministers, and the fact that she participated in publishing an "art and theology journal" as part of her role at Moody, *see* FAC ¶ 54.   Weighing heavily in Garrick's favor is the fact that her position, Instructor of Communications, has no obvious connection to religion.   Although Moody makes much of the fact that Garrick was an ordained minister, it glosses over the fact that it itself did not consider her to be a one, openly rejecting her ordained status by telling her to remove it from her resume, requiring her to sign a doctrinal statement explaining that women cannot hold certain church offices, and rejecting her requests to speak publicly at various Moody events and chapel services.   Finally, it may be the case that, like the plaintiff in *Grussgott*, Garrick was required to integrate religious teachings into her classes, but her complaint contains no allegations to that effect.   Accordingly, the allegations

---

[4]   Moody contends that the Faculty Manual—an excerpt of which is attached to Garrick's complaint—is fair game, because it is "central" to her claims.   *See* Mem. Supp. Mot. Dismiss at 1 n.2. This may be true as to Garrick's contract claim, which relates to contractual provisions contained within the manual.   But it is not true as to the ministerial exception, an affirmative defense that need not be anticipated in the complaint.   *See Sterlinski*, 934 F.3d at 571.

of the complaint do not conclusively demonstrate that Garrick falls within the ministerial exception.

## C. Church Autonomy Principles

Be that as it may, the overarching principle of religious autonomy still may require dismissal where a "religious employer offers a religious justification" for the adverse action or where the claim will otherwise "pose too much intrusion into the religious employer's Free Exercise and Establishment Clause rights." *Demkovich v. St. Andrew the Apostle Parish*, 343 F. Supp. 3d 772, 782, 785 (N.D. Ill. 2018); *see also McCarthy*, 714 F.3d at 976 (explaining that a "final judgment of a secular court resolving a religious issue" would impermissibly cause "governmental intrusion into religious affairs"); *cf. Alicea-Hernandez v. Catholic Bishop of Chi.*, 320 F.3d 698, 702 (7th Cir. 2003) (recognizing that, if the plaintiff had raised claims based on disagreements with church policies, this might "contravene the First Amendment prohibition against excessive entanglement").[5]

For instance, in *Demkovich*, the court concluded that a hostile-work-environment claim pertaining to the plaintiff's sexual orientation and marital status could not proceed where the harassment was rooted in the Catholic church's doctrinal opposition to same-sex marriage. 343 F. Supp. 3d at 786–87. The Tenth Circuit reached a similar decision in *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 657–59 (10th Cir. 2002), concluding that neither a minister nor her lay partner could bring sexual-harassment claims challenging the church's

---

[5]    The question posed by the Title IX exemption—whether application of the law would "not be consistent with the religious tenets" of the church—effectively raises the same issue. Accordingly, the Court considers its analysis in this section to apply to the Title IX exemption as well as general church autonomy principles.

ecclesiastical discussions about homosexuality. And in *Aparicio v. Christian Union, Inc.*, the Southern District of New York dismissed claims substantially similar to Garrick's; there, the plaintiff—whose position was not ministerial in nature—was prohibited from pursuing claims of discrimination arising from a religious institution's complementarian policy. No. 18-CV-0592, 2019 WL 1437618, at *8–10 (S.D.N.Y. Mar. 29, 2019). The court explained that, because the defendant's complementarian policy "reflect[ed] its right to choose who performs certain religious roles within the organization," the First Amendment "bar[red] the Court from asserting Title VII's secular sensibilities" on that policy through the vehicle of discrimination or retaliation claims.

Here, the essence of Garrick's claims derives from her advocacy in favor of women gaining access to ministry positions—taking a stance that, according to Garrick herself, is contrary to Moody's doctrinal views. She explains that the stated reason for her discipline and termination was her "egalitarian" view of gender and her failure to ratify Moody's complementarian doctrine. Furthermore, she contends that this reason was pretext and that she was actually fired because of her advocacy in favor of female students joining the Pastoral Ministry Program. *See* FAC ¶¶ 124–29. Either way, Moody's alleged reasons for firing Garrick were rooted firmly in its religious beliefs.

Garrick's disagreement with Moody's beliefs on the role of women in the ministry underlies the majority of Garrick's allegations. For instance, she contends she was told to remove her ordained status from her resume; that women were not allowed to teach in the Bible and Theology Programs; that she was attacked after advocating on behalf of an inclusive doctrinal statement regarding human sexuality; and that she was prohibited from speaking at chapel services. Even her hostile-work-environment claim implicates Moody's doctrine, given that much of the

hostility Garrick says she experienced arose out of her views on women in the ministry. *See id.* ¶¶ 28, 67(a)-(c), 95–96. Under these circumstances, if the Court were to delve into the disputes posed by Garrick, it would impermissibly inject the auspices of government into religious doctrine and governance. *See Alicea-Hernandez*, 320 F.3d at 702; *Demkovich*, 343 F. Supp. 3d at 786–87; *Aparicio*, 2019 WL 1437618, at *8–10.

This analysis rings particularly true as to Garrick's Title IX claim, which is based entirely upon the alleged retaliation Garrick faced for her advocacy in favor of female students entering the Pastoral Ministry Program. *See* FAC ¶¶ 69–79. Because this problem cannot be cured by additional pleading, Count I is dismissed with prejudice.[6]

But there are strains of Garrick's Title VII claims that may not be tied to Moody's religious beliefs. For instance, Garrick complains of antagonistic treatment by male colleagues and inconsistent treatment of female and male faculty members by the administration with respect to job duties, employment requirements, and performance reviews. To the extent Garrick can state a claim concerning these issues in a way that is untethered from her disagreements with Moody's religious views, she may be able to pursue those claims. Accordingly, the Court dismisses Counts III, IV, and V without prejudice and will grant Garrick leave to amend those claims in a manner consistent with this order.

## II. Breach of Contract

In her claim for breach of contract, Garrick contends that Moody failed to give her the requisite notice before deciding not to retain her after the spring semester. Moody contends that

---

[6] The Court thus need not address Moody's arguments concerning preemption of Garrick's Title IX claims by Title VII.

Garrick's contract claim too is precluded by the church autonomy doctrine, and that in any event, Garrick fails to plausibly allege the existence of a valid contract.

In certain circumstances, church autonomy principles may apply to state-law claims as well as employment-discrimination claims. Here, too, the ultimate question is whether adjudication of the claim will involve impermissible government interference into religious matters. For example, in *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, the Third Circuit refused to wade into the issue of whether a minister was terminated for cause in accordance with an employment agreement, because determining whether the minister had "provide[d] adequate spiritual leadership" would "impermissibly entangle the court in religious governance and doctrine." 903 F.3d 113, 120–21 (3d Cir. 2018); *see also Nevius v. Africa Inland Mission Int'l*, 511 F. Supp. 2d 114, 120 (D.D.C. 2007) (dismissing a breach-of-contract claim where "the court's inquiry . . . would tread too closely to religious affairs").

Here, Garrick alleges that she was initially given notice of her impending termination, but then was asked to leave immediately after she spoke out about her firing to student reporters. *See* FAC ¶¶ 62, 86. Although she contends that she was not "immediately" terminated because Moody was willing to let her continue teaching, the sequence of events she alleges could not be described as anything but an "immediate" termination. *See id.* ¶ 62 ("On April 26, after Ms. Garrick spoke to students and student reporters about her termination, [Moody] asked her to leave campus early and to turn in her computer and keys, stating that it would close out the semester for her."). Under the contractual provision she cites, immediate termination (that is, termination without a notice period) is permitted for "serious violations of Institute policy." *Id.* ¶ 85. Moody, of course, argues, that Garrick's actions did constitute a "serious violation," because they

ran contrary to Moody's doctrinal beliefs.

Given these circumstances, it would be impossible to resolve Garrick's breach-of-contract claim without first deciding whether she committed a "serious violation" of Moody's policies. And it is substantially likely that such a question would turn on matters of religion, given the reasons that—both Moody and Garrick agree—led to her termination. Accordingly, the Court concludes that adjudicating Garrick's breach-of-contract claim would require this Court to improperly entangle itself into Moody's rights to maintain and exercise its religious beliefs, and the claim is dismissed with prejudice.[7]

## Conclusion

For the reasons stated herein, Moody's motion to dismiss [68] is granted. Counts I, II, and VI are dismissed with prejudice. Counts III, IV and V are dismissed without prejudice, and Garrick is granted leave to amend her complaint to restate those claims consistent with this order within twenty-one days. If she does not do so, this action will be dismissed with prejudice, and judgment entered in Moody's favor. Garrick is cautioned that an amended complaint must stand complete and on its own, without referring back to prior pleadings.

**IT IS SO ORDERED.**                    **ENTERED:   9/25/19**

_____

**JOHN Z. LEE**
**United States District Judge**

---

[7]     Because the Court is allowing Garrick to replead Counts III through V and is dismissing Counts I, II, and VI with prejudice on other grounds, there is no need to address Moody's arguments regarding the plausibility of Garrick's allegations.