IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JANAY E. GARRICK,<br><br>       Plaintiff,<br><br> v.<br><br>MOODY BIBLE INSTITUTE,<br><br>       Defendant. | Case No. 1:18-cv-00573<br><br>Judge John Lee<br>Magistrate Judge Young Kim |

### DEFENDANT MOODY BIBLE INSTITUTE'S
### MOTION TO RECONSIDER
### THIS COURT'S DENIAL OF MOODY'S MOTION TO DISMISS
### AS TO THE TERMINATION CLAIMS IN PLAINTIFF'S
### SECOND AMENDED COMPLAINT

Christian M. Poland
Bryan Cave Leighton Paisner LLP
161 N. Clark Street, Suite 4300
Chicago, IL 60601-3315
312-602-5000
Fax: 312-602-5050
christian.poland@bclplaw.com

602568438.3

TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................. 1

II. THE ALLEGATIONS OF THE SECOND AMENDED COMPLAINT ........................... 1

III. THIS COURT'S DECISION DISMISSING GARRICK'S FIRST AMENDED COMPLAINT ........................................................................................................ 3

IV. THIS COURT'S DECISION GRANTING IN PART AND DENYING IN PART MOODY'S MOTION TO DISMISS GARRICK'S SECOND AMENDED COMPLAINT ........................................................................................................ 4

V. ARGUMENT ....................................................................................................... 4

    A. The SAC Was Not Materially Different from the FAC and Therefore Should Have Been Dismissed Like the FAC ................................................................. 4

    B. Under Binding Supreme Court Precedent, Whether a Religious Reason for a Religious Employer's Termination Decision is Pretextual Is Not a Permissible Inquiry under the First Amendment Religion Clauses ........................................... 6

    C. Court Decisions that Suggest Pretext May Permissibly Be Adjudicated Are Contrary to Our Lady and Hosanna-Tabor or Are Otherwise Inapposite .............. 9

    D. If this Court Decides to Proceed on the Basis that Pretext May Be Adjudicated, Moody Asks that the Court Certify the Issue for Interlocutory Appeal ............... 14

VI. CONCLUSION .................................................................................................. 15

602568438.3

I. INTRODUCTION

This Court's recent decision on the motion of Defendant, The Moody Bible Institute of Chicago ("Moody"), to dismiss the Second Amended Complaint of Plaintiff, Janay Garrick ("Garrick"), permitted Garrick's employment termination claims based on sex discrimination and retaliation to proceed. (Dkt. 126.) Moody respectfully submits that this was error. First, the Court had previously (and correctly) dismissed Garrick's termination claims under well-settled religious autonomy doctrines (*see* Dkt. 91), and the allegations in Garrick's Second Amended Complaint (Dkt. 97; "SAC") were not materially different. Second, the issue that this Court's opinion identifies as the reason this case must proceed is one that courts are not permitted to adjudicate. This Court's opinion identifies "pretext" as the issue to be adjudicated, that is, whether Moody's stated religious reason for Garrick's termination (which the SAC affirmatively pleads) was Moody's "real" reason, or whether unlawful sex discrimination or retaliation were actually its motivations. But under settled Supreme Court precedent, this Court is not authorized to decide (or permit a jury to decide) the question of pretext when a religious body terminates an employee for her admitted nonalignment with its religious requirements. Moody asks that this Court reconsider its denial of Moody's motion to dismiss and conclude that dismissal of Garrick's termination claims is required.

II. THE ALLEGATIONS OF THE SECOND AMENDED COMPLAINT

With respect to Garrick's termination claims, the SAC pleaded essentially the same facts as Garrick's First Amended Complaint. Garrick pleaded that "[o]n April 12, 2017, Ms. Garrick met with Mr. Davidhizar [the Vice President and Associate Provost of Faculty] and the Vice President of Human Resources, [at which time] Mr. Davidhizar told her that she did not fit in and that she was not aligned with MBI's doctrinal statement as it related to gender roles in ministry."

1

(SAC ¶¶ 21, 85; SAC Ex. A [EEOC Charge at 4].)[1] On April 17, 2017, Garrick was given a letter terminating her employment based on this religious nonalignment. (SAC ¶ 86; 4/17/17 letter attached hereto as Ex. A.[2]) The SAC explicitly pleads this religious basis for discharge:

> . . . Ms. Garrick was terminated for her stated position/disagreement with Moody's "Gender Roles in Ministry" addendum included in its doctrinal statement, Defendant stating that she could not sign the doctrinal statement based on her holding to an egalitarian position. In contrast, Moody holds a complementarian position that excludes women from certain roles within the church due to their gender.

(SAC ¶ 96.) While acknowledging Moody's religious reason for her discharge, Garrick pleads, "MBI's decision was pretext for its true motives – discrimination and retaliation." (SAC ¶ 89; *see also* SAC ¶ 97).

The SAC also pleads that Moody is a "post-secondary religious educational institution" "with the stated mission of training students for the Christian ministry." (*See* SAC ¶ 1; SAC Ex. A [Charge at 2].)[3] Faculty members are required to annually sign Moody's Doctrinal Statement, acknowledging their alignment with a variety of religious beliefs, including Moody's "Gender Roles in Ministry" statement, which communicates Moody's theological/Biblical position that certain pastoral roles are limited to men. (*See* SAC ¶¶ 80, 84, 85, 96; SAC Ex. A [Charge at 2, 4].) As stated above, Garrick disagreed with this "complementarian" view and instead espoused

---

[1] Garrick's sworn EEOC Charge (the "Charge"), which is Exhibit A to the SAC, was admissible in deciding Moody's motion to dismiss and is admissible in deciding this motion. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Garrick v. Moody Bible Institute*, 412 F. Supp. 3d 859, 862 n.2 (N.D. Ill. 2019) ("*Garrick I*") ("In addition to the complaint itself, on a motion to dismiss the Court may consider 'documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice.'" [quoting *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)]).

[2] This Court may also consider Garrick's termination letter, for the reasons stated in the preceding footnote.

[3] This Court could also take judicial notice of Moody's deeply religious nature from its publicly posted materials. See, e.g., www.moody.edu.

2

602568438.3

an "egalitarian" view. (*See* SAC ¶¶ 20, 80, 84, 85, 89, 93, 96; SAC Ex. A [Charge at 2, 4].)

III.  THIS COURT'S DECISION DISMISSING GARRICK'S FIRST AMENDED COMPLAINT

With respect to Garrick's termination claims, the allegations of the First Amended Complaint ("FAC") were essentially the same as those in the SAC. (*Compare* Dkt. 67 ¶¶ 20-67, 107-132 *with* Dkt. 97 ¶¶ 18-97, 107-32.) Based on Garrick's allegations, this Court held as follows in dismissing the FAC on religious autonomy grounds:

> Here, the essence of Garrick's claims derives from her advocacy in favor of women gaining access to ministry positions—taking a stance that, according to Garrick herself, is contrary to Moody's doctrinal views. She explains that the stated reason for her discipline and termination was her "egalitarian" view of gender and her failure to ratify Moody's complementarian doctrine. Furthermore, she contends that this reason was pretext and that she was actually fired because of her advocacy in favor of female students joining the Pastoral Ministry Program. *See* FAC ¶¶ 124–29. Either way, Moody's alleged reasons for firing Garrick were rooted firmly in its religious beliefs. [¶] Garrick's disagreement with Moody's beliefs on the role of women in the ministry underlies the majority of Garrick's allegations. . . . Under these circumstances, if the Court were to delve into the disputes posed by Garrick, it would impermissibly inject the auspices of government into religious doctrine and governance.

*Garrick I*, 412 F. Supp. 3d at 871-72. This Court did permit Garrick to re-plead certain claims, but only if she could do so independent of religious issues and disagreements:

> But there are strains of Garrick's Title VII claims that may not be tied to Moody's religious beliefs. For instance, Garrick complains of antagonistic treatment by male colleagues and inconsistent treatment of female and male faculty members by the administration with respect to job duties, employment requirements, and performance reviews. To the extent Garrick can state a claim concerning these issues in a way that is untethered from her disagreements with Moody's religious views, she may be able to pursue those claims.

*Id.* at 872.[4]

---

[4] Because *Garrick I* stated that Garrick's termination claims were plainly intertwined with religious issues, and because this quoted passage only identified non-termination issues that could possibly "not be tied to Moody's religious beliefs," Moody interpreted *Garrick I* as sounding the death knell for Garrick's termination claims. This Court's recent decision states otherwise.

3

IV.  THIS COURT'S DECISION GRANTING IN PART AND DENYING IN PART MOODY'S MOTION TO DISMISS GARRICK'S SECOND AMENDED COMPLAINT

Garrick's SAC did not heed this Court's directives in *Garrick I*. The SAC was not limited to allegations that were unrelated to Moody's religious beliefs, and the SAC again included all of the same disputes and issues that Garrick had with students, peer faculty members, and various administrators at Moody. In any event, on Moody's motion, this Court dismissed all of Garrick's claims other than her termination claims. (*See* Dkt. 126 ["*Garrick II*"] at 6 & n.3, 7-8, 14-15 [dismissing all hostile environment claims and noting that the only adverse employment action within the 300-day limitations period is Garrick's termination].)

As to Garrick's termination claims, *Garrick II* held that, based on a pleading difference, the SAC's termination claims survived, whereas the FAC's termination claims had not:

> Whereas the previous complaint had cast Garrick's objections to Moody's complementarian creed as the real reason for her firing, the present complaint portrays Moody's religious justification as a *pretext* for gender discrimination. *See* SAC ¶¶ 107, 127–32. Put differently, rather than questioning the reasonableness or legitimacy of Moody's religious beliefs, Garrick disputes whether those beliefs actually prompted her firing.

*Garrick II* at 10. Supporting this point, the Court wrote, "What proved fatal to that pleading [i.e., the FAC] was Garrick's allegation that 'she was actually fired because of her advocacy in favor of female students joining the Pastoral Ministry Program,'" citing FAC ¶¶ 124–29, which pleaded that "the reason given for termination was [Garrick's] egalitarian view on gender roles in ministry" and that "Garrick was fired for assisting a female student in filing a Title IX complaint" (FAC ¶¶ 124, 129). Because the SAC alleged that Moody's stated religious reason was pretextual, this Court declined to dismiss Garrick's discrimination and retaliation claims.

V.  ARGUMENT

  A.  The SAC Was Not Materially Different from the FAC and Therefore Should Have Been Dismissed Like the FAC

4

The first error that Moody believes this Court committed in denying Moody's motion to dismiss is in concluding that the SAC was materially different from the FAC. The Court's conclusion that the FAC "cast Garrick's objections to Moody's complementarian creed as the real reason for her firing" while the SAC "portrays Moody's religious justification as a *pretext* for gender discrimination" (*Garrick II* at 10) is not accurate in Moody's view. The following central allegations are in both the FAC and the SAC:

| Allegation | FAC ¶¶ | SAC ¶¶ |
| --- | --- | --- |
| Garrick admits that she holds doctrinal views about the role of women in ministry that are contrary to Moody's Doctrinal Statement, with which all faculty members must agree | 22, 64, 67(i), 124, 136, 138(b), 139 | 20, 38(i), 80, 85, 89, 96 |
| Garrick admits that Moody's stated reason for Garrick's termination was her nonalignment with its Doctrinal Statement | 61, 64, 124, 136 | 80, 85, 89, 96 |
| Garrick alleges that her termination was actually because of her gender | 64 | 97 |
| Garrick alleges that her termination was actually in retaliation for complaining about sex discrimination in employment or for complaining about a gender-based hostile work environment | 110(f) | 69(f), 129 |
| Garrick alleges that her termination was actually because of her advocacy in favor of female students under Title IX | 76, 129 | 96 |
| Garrick alleges that Moody's stated religious reason for her termination is a pretext for discrimination and retaliation | 64 | 89, 97 |

Furthermore, *Garrick I* expressly noted that the FAC pleaded that Moody's religious reasons were *pretextual*: "[Garrick] contends that this [termination] reason was pretext." 412 F. Supp. 3d at 872. Thus, the same allegations are contained in both the FAC and the SAC, including the alleged differentiation that the SAC pleaded the issue of pretext whereas the FAC did not.[5]

---

[5] Moody also does not understand *Garrick II*'s statements that the FAC "cast Garrick's objections to Moody's complementarian creed as the real reason for her firing" and did not allege that Moody's

5

602568438.3

Because of this, both the FAC and the SAC required adjudication of Moody's stated religious justification, which "impermissibly inject[s] the auspices of the government into religious doctrine" (*Garrick II* at 10), and the SAC should therefore have been dismissed like the FAC.

In any event, regardless of whether the SAC was materially different from the FAC, the basis on which this Court says this case must proceed—a dispute about whether Moody's stated religious reason for Garrick's termination was in fact its true motivation—is not a permissible inquiry under settled religious autonomy principles.

> B.  Under Binding Supreme Court Precedent, Whether a Religious Reason for a Religious Employer's Termination Decision is Pretextual Is Not a Permissible Inquiry under the First Amendment Religion Clauses

*Garrick II* states that Garrick's allegation that Moody's religious justification for her firing is pretextual is enough to defeat the religious autonomy doctrines and require this case to proceed. (*Garrick II* at 9-12.) Moody respectfully submits that this is not the law.

In the ordinary employment discrimination case, the question of pretext—that is, whether the employer's stated for a termination is "a lie, specifically a phony reason for some action" that is designed to cloak the employer's true and unlawful reason for the firing, *see, e.g., Graham v. Arctic Zone Iceplex, LLC*, 930 F. 3d 926, 929 (7th Cir. 2019)—may be a central issue requiring discovery and trial. But in the context of a religious employer's religiously motivated employment decisions, motive-probing pretext discovery and a jury trial are precisely the sort of intrusive inquiries that are prohibited by the Religion Clauses. The Supreme Court expressly made this point in *Hosanna-Tabor*:

---

stated reason was pretextual. (*Garrick II* at 10.) If, in fact, the FAC admitted that Garrick's religious dispute with Moody was the "real reason" for her termination and never claimed that Moody's reason was actually illegal gender discrimination or retaliation, the FAC should have been dismissed with prejudice. If a plaintiff admits that her employer's reason for firing her is a nondiscriminatory one, the employee has no discrimination or retaliation claim and the employer is entitled to judgment as a matter of law.

> The EEOC and Perich [i.e., the terminated employee] suggest that Hosanna–Tabor's asserted religious reason for firing Perich—that she violated the Synod's commitment to internal dispute resolution—was pretextual. That suggestion misses the point of the ministerial exception. The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful—a matter strictly ecclesiastical—is the church's alone.

*Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 194-95 (2012) (citation omitted).[6] The Supreme Court again affirmed the principle that pretext is off limits in *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020). In *Our Lady*, two Catholic elementary school teachers had brought suit alleging that their firings were the product of age discrimination and retaliation for requesting medical leave (in contrast to the schools' stated reasons). The Court ruled that both teachers fell within the scope of the ministerial exception, barring their claims. *See* 140 S. Ct. at 2066-69. The Court held, "When a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow." *Id*. at 2069. And it did not matter what particular reasons the schools gave for the employment decisions or, alternatively, whether the teachers claimed such reasons were pretextual. The Court explained:

> Among other things, the Religion Clauses protect the right of churches and other religious institutions to decide matters "'of faith and doctrine'" without government intrusion. . . . State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion. The First Amendment outlaws such intrusion.
> . . . This does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission. And a

---

[6] *See also id*. at 205 (Alito, J., concurring) ("For civil courts to engage in the pretext inquiry that respondent and the Solicitor General urge us to sanction would dangerously undermine the religious autonomy that lower court case law has now protected for nearly four decades.").

7

component of this autonomy is the selection of the individuals who play certain key roles.

*Our Lady*, 140 S. Ct. at 2060 (citations omitted). *Our Lady* further reinforced these principles, in Moody's very educational context:

> The religious education and formation of students is the very reason for the existence of most private religious schools, and therefore the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission. Judicial review of the way in which religious schools discharge those responsibilities would undermine the independence of religious institutions in a way that the First Amendment does not tolerate.

*Our Lady*, 140 S. Ct. at 2055.

The federal appellate courts have also expressly held that "pretext" inquiries are off limits when religious autonomy principles are in play. *See, e.g.*, *Lee v. Sixth Mount Zion Baptist Church*, 903 F.3d 113 (3d Cir. 2018) ( "parsing the precise reasons for [plaintiff] Lee's termination is akin to determining whether a church's proffered religious-based reason for discharging a church leader is mere pretext, an inquiry the Supreme Court has explicitly said is forbidden by the First Amendment's ministerial exception" [citing *Hosanna-Tabor*, 565 U.S. at 194-95]); *Myhre v. Seventh-Day Adventist Church Reform Movement Am. Union Int'l Missionary Soc'y*, 719 Fed. App'x 926, 927-29 (11th Cir. 2018) (former employee's breach-of-contract claim against church denomination for terminated retirement benefits was properly dismissed because ecclesiastical abstention doctrine prevented court from evaluating denomination's view of the propriety of plaintiff's conduct); *Petruska v. Gannon Univ.*, 462 F.3d 294 (3d Cir. 2006) (affirming Rule 12(b)(6) dismissal of Title VII claims of gender discrimination and retaliation of female Catholic university chaplain; plaintiff argued that the university's decision was "merely pretext for gender discrimination," but the court held that adjudicating the university's reasons for its decisions would be to impermissibly evaluate its

8

decisions as to ministerial functions); *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657-59 (10th Cir. 2002) (affirming dismissal of youth minister's Title VII claims of harassment based on her sexual orientation, as barred by the church autonomy doctrine; courts may only adjudicate "purely secular disputes").[7]

Thus, deciding whether Moody's given religious reason for Garrick's termination is pretextual is not a permissible inquiry. Therefore, Garrick's termination claims cannot proceed.

### C. Court Decisions that Suggest Pretext May Permissibly Be Adjudicated Are Contrary to *Our Lady* and *Hosanna-Tabor* or Are Otherwise Inapposite

*Garrick II* cites five cases that it says stand, in one way or another, for the proposition that it is permissible for a secular court to judge whether a religious employer's motives are pretextual. Each is distinguishable.

This Court notes that *Curay-Cramer v. Ursuline Academy*, 450 F.3d 130 (3d Cir. 2006), states that "when a plaintiff 'only question[s] whether [religion] was the actual motivation' for an adverse action, the employer's religious autonomy is not threatened." (*Garrick II* at 10 [quoting *Curay-Cramer*, 450 F.3d at 139.) Moody does not consider this a fair point to draw from *Curay-Cramer*. In *Curay-Cramer*, the female teacher at a Catholic school had signed a public advertisement supporting a pro-choice cause, which the school said was inconsistent with

---

[7] *See also Curay-Cramer v. Ursuline Academy*, 450 F.3d 130, 139 (3d Cir. 2006) ("Comparing Curay–Cramer to other Ursuline employees who have committed 'offenses' against Catholic doctrine would require us to engage in just the type of analysis specifically foreclosed by *Little* [*v. Wuerl*, 929 F.2d 944 (3d Cir. 1991)]"); *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1360-61 (D.C. Cir. 1990) ("the first amendment forecloses any inquiry into the Church's assessment of Minker's suitability for a pastorship, even for the purpose of showing it to be pretextual"; "any inquiry into the Church's reasons for asserting that Minker was not suited for a particular pastorship would constitute an excessive entanglement in its affairs"); *EEOC v. Mississippi College*, 626 F.2d 477, 485 (5th Cir. 1980) (if the religious organization presents a plausible case that the adverse employment action was religiously motivated, the EEOC is constitutionally prohibited from investigating whether the decision is pretext for gender or race discrimination); *cf. Alicea-Hernandez v. Catholic Bishop of Chi.*, 320 F.3d 698, 702-03 (7th Cir. 2003) (race and gender claims were barred by the ministerial exception; "To rule otherwise would enmesh the court in endless inquiries as to whether each discriminatory act was based in Church doctrine or simply secular animus").

9

Catholic teaching and terminated her employment. The teacher sued, alleging that the school's reason was pretextual and that similarly situated male employees were not also fired. Relying on pre-*Hosanna-Tabor* precedent, *Curay-Cramer* made the point that even the mere "*inquiry* into the good faith of the position asserted by the clergy-administrators" could "impinge on rights guaranteed by the First Amendment." 450 F.3d at 138 (quoting *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979)) (emphasis added). It then held, "[W]ith the allegation that male employees, who committed substantially similar offenses, were treated differently than was Curay–Cramer, we would have to assess the relative severity of offenses. This exercise would violate the First Amendment." 450 F.3d at 139. In affirming the Rule 12(b)(6) dismissal of the plaintiff's sex discrimination claim, the court concluded by noting that the types of cases which courts may permissibly adjudicate are likely those in which "a religious employer does not offer a religious justification for an adverse employment action against a non-ministerial employee." *Id*. at 142. Because adjudication of Garrick's claim will require analysis of whether the doctrinal nonalignment of alleged similarly situated male employees was a similarly grave doctrinal problem, Garrick's claims are barred as in *Curay-Cramer*.[8]

---

[8] To illustrate further, consider what this Court will potentially be forced to adjudicate if it proceeds to decide the question of pretext in this case. As this Court has noted, Garrick alleges that male employees who were not aligned with Moody's Doctrinal Statement were not also fired or were otherwise treated more favorably. (*See, e.g.*, SAC ¶ 38(i)-(j).) To decide this issue, this Court may need to adjudicate a variety of entangling religious questions:
    On what doctrinal point(s) were the male employees not in alignment?
    How did Moody view such male employees' nonalignment?
    Where did the doctrinal point rank in the hierarchy of Moody's theological beliefs?
    What biblical or theological support did the male employee have for his stated position
        and was his position in fact contrary to Moody's Doctrinal Statement?
    How vocal was the male employee's nonalignment and was that a religious consideration?
    Which doctrinal disagreements are considered by Moody to be terminable nonalignment,
        which are not, and why?
    Are Moody's doctrinal views sincerely held?
    Has Moody consistently enforced its doctrinal views?
    Are there religious grounds for any inconsistent enforcement, if any, of Moody's doctrinal views?

The case of *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 172 (2d Cir. 1993), is neither controlling nor helpful. DeMarco was decided in 1993, did not involve the religious autonomy doctrines in play here, and is plainly inconsistent with *Hosanna-Tabor* and *Our Lady*. But even *DeMarco,* in permitting a Catholic school math teacher's age discrimination claim to proceed, noted that the court (and jury) could not pass judgment on the religious employer's motivations: "[We] conclude that ADEA plaintiffs may not challenge the plausibility of putative religious purposes. A fact-finder will necessarily have to presume that an asserted religious motive is plausible in the sense that it is reasonably or validly held." 4 F.3d at 171.

The case of *Redhead v. Conference of Seventh-Day Adventists*, 566 F. Supp. 2d 125, 134 (E.D.N.Y. 2008), which this Court quotes as saying "an employer's simple assertion of a religious motive usually will not prevent a reviewing court from asking whether that motive was in fact pretext within the meaning of *McDonnell Douglas*," is also nonbinding and inapplicable. It too pre-dates, and is inconsistent with, *Hosanna-Tabor*'s affirmation of the ministerial exception and related religious autonomy principles. Even so, it acknowledged that "When a Title VII case is brought against a religious organization, however, the evidence that may be considered at this stage is circumscribed in that neither the court, nor the jury, may question the sincerity of a defendant's belief in a proffered religious justification." 566 F. Supp. 2d at 134.

*Garrick II* (p. 11, n.6) criticizes Moody's reliance on *Fratello v. Archdiocese of New York*, 863 F.3d 190 (2d Cir. 2017). But *Fratello* supports dismissal in this case. While this Court is correct that the *Fratello* court only found it necessary to conclude that the Catholic school principal was a minister within the meaning of the ministerial exception to justify

---

Just as held in *Curay-Cramer*, the analysis required to decide whether male and female employees were treated differently by Moody on points of doctrinal conflict involves religious questions that this Court is not qualified to, or permitted to, adjudicate.

11

602568438.3

affirming the dismissal of her claims of sex discrimination and retaliation, the *Fratello* court's discussion encompassed the principle that courts are not permitted to adjudicate questions of pretext. First, the Court discussed and followed *Hosanna-Tabor*, which rejects the adjudication of pretext (see discussion above). *See* 863 F.3d at 201-06. Second, *Fratello* noted that even its pre-*Hosanna-Tabor* case law did not permit adjudication of pretext. Quoting its precedent in *Rweyemamu v. Cote*, 520 F.3d 198, 207 (2d Cir. 2008), the court wrote, "[E]ven when we permit suits by lay employees, we will not subject to examination the genuineness of a proffered religious reason for an employment action." 863 F.3d at 202 n.25. Third, the *Fratello* court expressly noted the prohibition on adjudicating pretext, which the Second Circuit had adopted in *Rweyemamu*: "Indeed, 'in order to prevail on his Title VII claim, he [would have had to] argue that the decision of the [religious authorities] was not only erroneous, but also pretextual.' [*Rweyemamu*, 520 F.3d at 209.] We therefore held that his 'claim fail[ed] at its inception' '[b]ecause Title VII [was] unconstitutional as applied in th[at] case.' *Id*." 863 F.3d at 202 (brackets in original, except for added citation). Finally, the *Fratello* court wrote that even where the ministerial exception does not apply, a court still may have no authority to question a religious employer's articulated religious basis for an employment decision: "If, as the district court concluded, the ministerial exception applies, the reason for her termination does not matter. Had a religious reason been proffered, however, our precedent suggests that a foray into the ministerial exception would perhaps not be necessary." *Id*. at 197 n.15. All of this supports the conclusion that this Court may not proceed to adjudicate the issue of pretext in this case.

*Garrick II* also relies on *Sterlinski v. Catholic Bishop of Chi.*, 934 F.3d 568 (7th Cir. 2019), in deciding that pretext is an issue this Court may adjudicate. But the very brief discussion of pretext in *Sterlinski* pertains to pretext in a different context and is also dicta.

12

*Sterlinski* affirmed the dismissal of a church Director of Music's claims of discrimination and retaliation upon a finding that he qualified as a minister under the ministerial exception. The pretext issue that *Sterlinski* mentions was not a question of the honesty of the religious employer's stated reason for the adverse employment action; *Sterlinski's* discussion addressed the concern that a religious employer might attempt to over-designate its employees as "ministers" in order to gain the immunity provided by the exception. *See* 934 F.3d at 571 ("A church claiming "minister" status for bus drivers would invite a finding of pretext, but a church claiming that persons who chant, sing, or play music during a service perform religious functions is on solid ground."). In any case, because there was no issue of pretext present in the case ("Sterlinski does not contend that the Bishop's justification for calling him a 'minister' is pretextual," *id*.), the *Sterlinski* court's mention of pretext is dicta. Finally, Sterlinski's discussion of pretext is difficult to square with *Hosanna-Tabor* (see discussion above) and its point was essentially rejected in *Our Lady*.[9]

*Garrick II* concludes its discussion of Moody's religious autonomy defenses with comments on *Demkovich v. St. Andrew the Apostle Parish*, 973 F.3d 718 (7th Cir. 2020) (which had not been decided when Moody filed its motion to dismiss). As the Court notes, *Demkovich* involved only hostile environment claims, and because the Court has dismissed Garrick's hostile environment claims, *Demkovich* has little to no present relevance.[10]

---

[9] *Our Lady* emphasizes that the religious organization's view of whether the employee serves a religious role in its ministry is entitled to deference. *See* 140 S. Ct. at 2066. "[T]he Religion Clauses require civil courts to defer to religious organizations' good-faith claims that a certain employee's position is 'ministerial.'" *Id*. at 2069-70 (Thomas, J., joined by Gorsuch, J., concurring).

[10] Moody notes, however, that the Court's comment that "unlike Garrick, the musician did not allege that the organization's religious justification for the derogatory remarks was pretextual" (*Garrick II* at 14) is not on point. Pretext is only an issue for tangible job employment actions; if an employer fails to remedy a hostile environment based on sex or some other protected characteristic, pretext is not part of the analysis. *See generally Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833-34 (7th Cir. 2015) (discussing the elements of a hostile environment claim). Thus, to the extent

13

In sum, Moody submits that the cases on which *Garrick II* relies in deciding to proceed with adjudicating whether Moody's religious justification for Garrick's termination is pretextual do not support the point, and that such inquiry is, in fact, barred by Supreme Court precedent.

> D. *If this Court Decides to Proceed on the Basis that Pretext May Be Adjudicated, Moody Asks that the Court Certify the Issue for Interlocutory Appeal*

If this Court is inclined to proceed with this case on the basis that pretext is a central issue to be adjudicated, Moody asks that the Court certify for interlocutory appeal this important question. In Moody's view, proceeding with discovery and a possible trial on the question of Moody's religious motivations will subject it to unconstitutional judicial interference. The right of religious autonomy provides a form of immunity from the burdens of litigation. *See Sterlinski v. Catholic Bishop of Chicago*, 934 F.3d 568, 569-72 (7th Cir. 2019) (the ministerial exception is not just as an affirmative defense to liability, but also a limitation on discovery, because the ministerial exception exists "precisely to avoid . . . judicial entanglement in, and second-guessing of, religious matters," including by "subjecting religious doctrine to discovery"); *Korte v. Sebelius*, 735 F.3d 654, 677-78 (7th Cir. 2013) ("where it applies, the church-autonomy principle operates as a complete immunity, or very nearly so"). A court's interference with such right cannot be undone by an appeal after final judgment, so interlocutory appeal is appropriate. *See McCarthy v. Fuller*, 714 F.3d 971 (7th Cir. 2013) ("The harm of such a governmental intrusion into religious affairs would be irreparable, just as in the other types of case in which the collateral order doctrine allows interlocutory appeals.").

Certification under 28 U.S.C. § 1292(b) is an appropriate vehicle to secure timely appellate review. *See generally Ahrenholz v. Bd. of Trustees of Univ. of Ill.*, 219 F.3d 674, 675

---

this Court believed that *Demkovich* supported its rejection of Moody's religious autonomy defenses, Moody respectfully disagrees.

14

(7th Cir. 2000). Section 1292(b) provides, "When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order." The question of whether pretext may be adjudicated in the context of Garrick's claims is a "controlling question of law" and an "immediate appeal . . . may materially advance the ultimate termination of the litigation" because if the Seventh Circuit agrees that pretext may not be adjudicated in this case, Moody's motion to dismiss will need to be granted. Moody proposes that this Court certify the following question for interlocutory appeal:

> Where a religious school protected by the church autonomy doctrine of the First Amendment terminates the employment of a teacher for the teacher's conceded non-alignment with its religious doctrine, may a court permit discovery and trial under Title VII on the question of whether the school's stated religious reason for termination is pretextual?"

Moody's request is consistent with recent Seventh Circuit practice on the interlocutory appeal of important religious autonomy issues. *See Demkovich*, 973 F.3d at 721-22 (granting interlocutory appeal on the district court's 1292(b) certification of an important religious autonomy question). If the Court desires further briefing on the certification question, Moody will provide it.

VI. CONCLUSION

For the reasons stated above, Moody asks that the Court reconsider its decision denying Moody's motion to dismiss as to Garrick's termination claims (Dkt. 126) and dismiss such claims.[11]

Dated: October 27, 2020                      Respectfully submitted,

                                                               s/ Christian Poland

---

[11] In light this motion, Moody also requests that its deadline to Answer the SAC be suspended.

15

                                                                                One of the Attorneys for Defendant,
The Moody Bible Institute of Chicago

Christian M. Poland
Bryan Cave Leighton Paisner LLP
161 N. Clark Street, Suite 4300
Chicago, IL 60601-3315
312-602-5000
Fax: 312-602-5050
christian.poland@bclplaw.com

602568438.3

## CERTIFICATE OF SERVICE

Christian Poland, one of the attorneys for Defendant, The Moody Bible Institute of Chicago, states that on October 27, 2020, he served a true and correct copy of the foregoing document upon Plaintiff by causing said document to be delivered to her via the Court's ECF system, addressed as follows:

> Janay E. Garrick
> P.O. Box 8633
> Moscow, ID 83843
> 407-803-3051
> janay.garrick@gmail.com

s/ Christian Poland

602568438.3



*Office of the Vice President and Associate Provost of Faculty*

April 17, 2017

Ms. Janay Garrick
Instructor of Communications
Moody Bible Institute

Dear Janay,

Thank you for meeting with me last week along with Debbie Zelinski of the Human Resources department. The purpose of the meeting was to gain clarification as to your position on "Gender Roles in Ministry." You articulated in our meeting that you hold to the egalitarian view. Granted, this view is within the theological bounds of evangelicalism but it is not the view of Moody Bible Institute. As you know, faculty and upper administration must annually confirm the doctrinal statement which includes the complementarian view of gender roles without "disclaimers, clarifications, or personal exceptions...." For the record I would like to state that your signing of the doctrinal statement in previous years was based on the understanding that since you were approved for hiring you must therefore be able to sign the statement. However, given that your view is different from that of Moody, we will not give you a contract for the next academic year.

Since it is April, Moody will pay your monthly salary and your benefits will continue through December 2017 without any teaching responsibilities. Moody will also pay for your MFA course scheduled for summer 2017. We please request that you vacate your office by June 30, 2017 and we will notify colleagues of your departure on July 1.

Thank you for your service these last five semesters and may God continue to open doors for you that will allow for your continued professional and personal growth.

Sincerely,

Larry J. Davidhizar, PhD
Vice President and Associate Provost of Faculty
Moody Bible Institute

LJD:ps

cc: Dr. Junias Venugopal, Provost
    Dr. James Spencer, Vice President and Dean of the Moody Bible Institute
    Dr. Terry Strandt, Division Chair, Music and Media Arts
    Ms. Debbie Zelinski, Vice President, Human Resources

    

820 N. LaSalle Blvd.   (800) DL MOODY   moody.edu
Chicago, IL 60610      (312) 329-4000

EXHIBIT A